MARK WRAY, #4425
LAW OFFICES OF MARK WRAY
608 Lander Street
Reno, Nevada 89509
(775) 348-8877
(775) 348-8351 fax
Attorneys for Petitioners
THE ARK, INC. and AEGIS COUNCIL, LLC

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

THE ARK, INC. and AEGIS
COUNCIL, LLC,

                Petitioners,       Case No.

    vs.

INTERNAL REVENUE SERVICE,

                Respondent.
_____/

## PETITION FOR ORDER QUASHING SUMMONSES

COME NOW Petitioners The Ark, Inc. and Aegis Council, LLC and petition for an order quashing the summonses issued May 11, 2012 by the Respondent Internal Revenue Service and by this petition respectfully allege:

1.     This Court has jurisdiction over this petition pursuant to 28 U.S.C. §1331 because this petition arises under the laws of the United States, specifically, 26 U.S.C. §7602, which governs the information gathering powers of the Respondent Internal Revenue Service.

2.     Venue is proper in the United States District Court for the District of Nevada under 28 U.S.C. §1391(b) and (c).

1

3.      Petitioner The Ark, Inc. is a dissolved Nevada corporation with its former principal place of business at 155 Cadillac Place, Reno, Nevada, which at all relevant times was engaged in the business of financial advisory and marketing.

4.      Petitioner Aegis Council, LLC is a Nevada limited liability company with its principal place of business at 155 Cadillac Place, Reno, Nevada, which at all relevant times was engaged in the business of a financial advisory and marketing.

5.      Late in the afternoon of April 26, 2007, IRS special agents David Taylor and Landon Tuchenor appeared at Petitioners' door and showed their business cards, advising Petitioners' owner, Stephanie Olsen, that they would like to talk to her because someone in their office asked them to speak to her.

6.      Special agents Taylor and Tuchenor had not made an appointment and arrived unannounced.

7.      Prior to Taylor and Tuchenor appearing at Petitioners' place of business, no one from the IRS had contacted or communicated with Petitioners concerning any alleged violation of any tax law.

8.      Because it was near the end of the day, Olsen asked Taylor and Tuchenor to return the next morning.

9.      On April 27, 2008, Taylor appeared at Petitioners' place of business with four IRS summonses directed to each of four companies, two of those companies being the Petitioners, demanding that they copy and produce all of their business, corporate and financial records for the years 2006 through the date of the summonses.

10.     A true copy of the summons issued to The Ark, Inc. is attached as Exhibit 1.  The summonses to the other three companies are identical except the name of the company.

11.     The summonses required six years of records to be produced no later than 10 a.m. May 10, 2012, which allowed Petitioners nine business days to copy virtually all of their records of business activity over a six-year time period.

12.     The summonses notified Petitioners that the IRS was conducting a criminal investigation; further, if Petitioners did not comply as directed, a person responsible would be arrested and brought before the Court to stand trial for contempt.

13.     On April 27, 2012, Petitioners' counsel Mark Wray provided powers of attorney (Form 2848) to Taylor and asked Taylor to explain what the IRS was investigating.

14.     Taylor told Wray that "Aegis Shield" was the topic and "you can't sell a loss."  Despite requests to elucidate, Taylor has declined to explain anything to Petitioners or their counsel beyond stating the phrases "Aegis Shield" and "you can't sell a loss."

15.     Aegis Shield is a leveraged forward contract that is not a product of the Petitioners, but is a financial product which was made available to clients of Petitioners to purchase from another company in approximately the end of 2009.

16.      The summonses do not ask for records concerning Aegis Shield, but rather for business, corporate, and financial records of the four companies over a six-year period, including years the years 2006, 2007 and 2008, before the Aegis Shield product even existed.

17.     On May 1, 2012, Wray faxed a communication to Taylor complaining that the demands in the summonses would require a huge undertaking and involve massive amounts of documents.  Wray questioned why the IRS was not asking for records concerning Aegis Shield, but instead, the IRS appeared to be engaged in a fishing expedition for records of the four companies dating back years before Aegis Shield even existed.

18.     On or about May 3, 2012, Taylor notified Wray that the summonses could be disregarded because the IRS would be issuing replacement summonses.

19.     On May 11, 2012, Taylor issued and served on Petitioners two new summonses, true copies of which are attached as Exhibit 2.

20.     The new summonses contain three main categories of documents:

3

(a)     The first category of records in the new summonses was books and records, broadly defined to include all records relating to any banking, transactional or financial matters, and all client files, for a six-year period from 2006 to May 11, 2012.

(b)     The second category of records was unclear, but appeared to relate to all client records for private placement insurance, captive life insurance, insurance premium financing, and "repatriation of untaxed funds", none of which has anything to do with Aegis Shield, and none of which are programs that the Petitioners have actually sold to clients; however, insofar as the second category demanded client files, the records demanded in the second category were already demanded in the first category anyway.

(c)     The third category of records was for records of presentations, including webinars, including the "leveraged forward contract program", which would loosely describe Aegis Shield, although the demands in the third category related to other presentations as well.

21.     The summonses purported to require the Petitioners produce all the requested records by 10 a.m. on May 22, 2012 – a period of essentially five business days -- or else a person responsible for the noncompliance would be subject to arrest for contempt.

22.     Stephanie Olsen was the president of The Ark, Inc. and is the president of Aegis Council, LLC.

23.     During the time period covered by the summonses, Ms. Olsen managed up to 18 employees at one time at the Reno offices of The Ark, Inc., but at present, she has only three remaining employees, including two in Reno and one in Salt Lake City.

24.     From 2006 until it dissolved in 2010, The Ark, Inc. had on its database an estimated 4,500 to 5,000 contacts, including an estimated 2,500 clients.

25.     For each client, The Ark, Inc. and Aegis Council, LLC typically would maintain a file that included various forms of agreements, such as corporate or limited liability company formations, family and other trusts, correspondence, financial statements, assets lists, and a myriad of other financial planning-related records, kept in

4

electronic form on a computer, in hard copy form in a file, or both.  Each client would typically have one or more service agreements with The Ark, Inc.  In addition, for each client there would be emails and call logs pertaining to each client.  A client file therefore would be similar in nature and scope to what a law firm keeps for each of its clients.

26.    The summonses issued to Petitioners on May 11, 2012 purported to allow Petitioners five business days to reproduce *inter alia* every client file for thousands of clients over a six year period.

27.    Although the Respondent IRS and Taylor refuse to explain the alleged purpose of their investigation, Petitioners are informed and believe that the Respondent's summonses knowingly abused the process by demanding Petitioners produce records that are far outside any possible legitimate investigatory purpose.

28.    Petitioners are further informed and believe that the Respondent crafted the summonses to abuse the process, by requiring the Petitioners to reproduce virtually every single record of their businesses for a six year period.

29.    Petitioners are further informed and believe that the Respondent knowingly drafted the summonses so that complying with them would be virtually impossible given the limited resources available to Petitioners and the vast breadth of the document demands.

30.    Petitioners are further informed and believe that the Respondent issued the summonses knowing and having reason to know that attempting to comply would force Petitioner Aegis Council, LLC to cease doing business entirely.

31.    Upon receiving the summonses on May 11, 2012, Wray faxed a complaint to Taylor about the size and breadth of the request, a true copy of which is attached as Exhibit 3, and Taylor responded telephonically that he would allow additional time for compliance, so long as all the records that could be reproduced by May 22 were in fact copied and delivered.

32.     Wray advised Taylor that the Petitioners did not know the appropriate procedure for objecting to an IRS subpoena but that the Petitioners would learn how and file a motion to quash.

33.     Generally, the power of the IRS to obtain records through criminal investigations is broad but not unlimited.

34.     The IRS is authorized under 26 U.S.C. §7602 to obtain documents or testimony from a taxpayer for the purpose of inquiring into whether an offense related to the internal revenue laws has been committed, subject to satisfying a four-step prima facie showing: (1) that the investigation will be conducted pursuant to a legitimate purpose; (2) that the inquiry may be relevant to the purpose; (3) that the information sought is not already within the Commissioner's possession; and (4) that the administrative steps required by the Internal Revenue Code have been followed. *United States v. Powell,* 379 U.S. 48, 57-58, 85 S. Ct. 248, 13 L. Ed. 2d 112 (1964)); *United States v. Dynavac, Inc,* 6 F.3d 1407, 1414 (9th Cir. 1993).

35.     In *Powell,* the court said:  "A court may not permit its process to be abused. Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation.  *Id.*

36.     Once a prima facie showing is made by the IRS, the burden then shifts to the taxpayer to "challenge the summons on any appropriate ground." *Powell,* 379 U.S. at 58. An "appropriate ground" is established "when the taxpayer disproves one of the four elements of the government's *Powell* showing, or otherwise demonstrates that enforcement of the summons will result in an abuse of the court's process." *United States v. Rockwell Intern.,* 897 F.2d 1255, 1262 (3rd Cir. 1990).

37.     In responding to the Government's prima facie case, a taxpayer must factually oppose the Government's allegations by affidavit.  Legal conclusions or mere memoranda of law will not suffice. *Thornton v. United States,* 493 F.2d 164, 167 (3d Cir. 1974)).  This petition is verified under oath.

6

38.     A "heavy" burden falls on the taxpayer to show an abuse of process or lack of good faith.  *United States v. Abrahams,* 905 F.2d 1276, 1280 (9th Cir. 1990);  *Liberty Financial Servs. v. United States,* 778 F.2d 1390, 1392 (9th Cir. 1985).

39.     That heavy burden is not made lighter on the taxpayer when the IRS refuses to discuss the nature and purpose of its investigation, as has occurred in this case.  It is fairly difficult for the taxpayer to carry its burden of disproving the second element of the *Powell* test, that the "inquiry is relevant to the purpose" of the investigation, in a situation where the purpose of the investigation is being concealed from the taxpayer.

40.     In addition to other benefits in enforcing administrative summonses, the IRS has the benefit of a relaxed standard of "relevance."  The IRS is not "required to establish that the documents it seeks are actually relevant in any technical, evidentiary sense." *United States v. Arthur Young & Co.,* 465 U.S. 805, 814, 104 S. Ct. 1495, 79 L. Ed. 2d 826 (1984).   The IRS only needs to show "*potential* relevance to an ongoing investigation, without reference to its admissibility." *Id.* (emphasis in original).

41.     Despite the advantages enjoyed by the IRS, and despite the refusal of the IRS to explain what it is allegedly investigating, Taylor has stated that the investigation concerns Aegis Shield and "you can't sell a loss".  From these remarks it fairly may be deduced and inferred that records *prior to the time that Aegis Shield was available* should be irrelevant, even under the lax standard of "relevance" enunciated in *Arthur Young, supra.*

42.     Since Aegis Shield became available in late 2009, and the summonses demand all the books and records, including client files and other documents from 2006 forward, the summonses do *not* have potential relevance to the investigation to the extent they call for records to be produced from prior to October, 2009, and the summonses should be quashed under the relevance standard of *Powell* and *Arthur Young.*

43.     The "heavy" burden of showing lack of good faith and abuse of process may be difficult to meet in other cases, but here, the (1) the summonses purport to compel the Petitioners to produce a massive quantity of records,  (2) in an impossibly short

period of five business days, (3) after the IRS had served an equally oppressive summons, (4) in which summonses the demands continue to be unfathomably overbroad, and (5) the records demanded are irrelevant to the supposed purpose of the investigation.

44.     Petitioners are informed and believe that the ulterior purpose of the summonses is to force Petitioners to cease operating their business to try to reproduce all the records demanded by the summonses.

WHEREFORE, Petitioners respectfully request:

1.     That the Court determine the nature and purpose of the IRS investigation and that the summonses are irrelevant thereto;

2.     That the Court quash the summonses;

3.     That the Court award reasonable attorneys fees and costs; and

4.     That the Court award all other appropriate relief.

DATED: May 21, 2012            LAW OFFICES OF MARK WRAY


By _____
    MARK WRAY
Attorneys for Petitioners
THE ARK, INC. and AEGIS COUNCIL, LLC

8

<u>VERIFICATION</u>

The undersigned is the duly authorized officer, manager and agent of Petitioners and is familiar with the contents of the foregoing petition.  The facts stated in the foregoing petition are true and correct, except for facts stated on information and belief, and as to those facts, the undersigned believes them to be true.  This verification is executed under the penalties of perjury under the laws of the United States at Reno, Nevada on May 21, 2012.

STEPHANIE OLSEN

9

1

<u>CERTIFICATE OF SERVICE</u>

2

    The undersigned employee of the Law Offices of Mark Wray certifies that a true

3

copy of the foregoing document was served by personal delivery and also sealed in an

4

envelope with first class postage prepaid thereon and served via certified U.S. Mail at

5

Reno, Nevada on May 21, 2012 addressed as follows:

6

    David Taylor, Special Agent

7

    Internal Revenue Service
    200 S. Virginia St., Suite 105

8

    Reno, NV 89501

9

    Daniel G. Bogden, U.S. Attorney
    100 W. Liberty St., Ste 600

10

    Reno, NV 89501

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28